## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| RALPH L. BOOP, | : | |
| Plaintiff, | : | |
| | | Case No. 3:13cv00098 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| CAROLYN W. COLVIN, | : | Chief Magistrate Judge Sharon L. Ovington |
| Acting Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

### I.    Introduction

Plaintiff Ralph Boop sought financial assistance from the Social Security

Administration by applying for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") in January 2006, alleging disability since March 23, 2005, due to

back problems, a herniated disc, diabetes, and high blood pressure.  (Tr. 63-65, 399-401;

79).

After various administrative proceedings, Administrative Law Judge ("ALJ")

Thomas R. McNichols, II denied Boop's applications based on his conclusion that Boop's

impairments did not constitute a "disability" within the meaning of the Social Security

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Act. (Tr. 15-26).  The Appeals Council denied Boop's request for review, (Tr. 6-8), and the ALJ's decision became the Commissioner's final decision.  Boop sought judicial review of the decision, and in December 2010, this Court remanded his claims to the Social Security Administration for further consideration, including regarding his obesity. (Tr. 507-521).

Additional evidence was added to the file, and, in December 2011 ALJ McNichols held another hearing on Boop's claims.  (Tr. 577-783, 784-834).  In January 2012, ALJ McNichols issued a second decision, again finding Boop not disabled.  The ALJ's nondisability determination and resulting denial of benefits later became the final decision of the Social Security Administration.  Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Boop is now due.

This case is before the Court upon Boop's Statement of Errors (Doc. #11), the Commissioner's Memorandum in Opposition (Doc. #15), Boop's Reply (Doc. #16), the administrative record, and the record as a whole.

## II.    Background

### A.    Boop's Vocational Profile and Testimony

Boop was 38 years old on the alleged disability onset date, which defined him as a "younger individual age 18-44." He has subsequently changed age category to a "younger individual age 45-49."  *Id.*; *see also* Tr. 504 (citing 20 C.F.R. §§ 404.1563 and 416.963).[2]

---

[2]The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI/DIB Regulations.

Boop testified before ALJ McNichols on February 12, 2009, June 19, 2009, and December 14, 2011.  In his 2009 decision, the ALJ summarized Boop's testimony from the first two hearings as follows:

Testimony at the Hearing Held on February 12, 2009

The claimant testified that he stood 5 feet, 7 inches tall and weighed 260 pounds. He used to weigh as little as 210 pounds, and he had gained weight.  He had lived with a friend off and on.  He drove once or twice a week.  He graduated from high school, but he claimed to have some trouble with reading and writing.  He was terminated from his job because of a back injury.  He had back surgery, but he complained that he still had low back pain and numbness in his leg.  He had a history of diabetes.  Although he had used insulin, his blood sugars still ran high. He had experienced weakness and fatigue and sometimes could not get out of bed. He said he had asthma and was sensitive to cold, hot, or humid weather.  He related that he was depressed and had anger issues.  He did not want to be around people.

The claimant testified further that he had experienced medication side effects of dry mouth and sleepiness.  He had constant pain in his back and both legs as well as numbness in his legs.  The pain in his back was worse than in his legs.  He could walk one block, stand 10-to-15 minutes, and sit 10-to-15 minutes, each at a time.  He could lift 2-to-5 pounds.  He could cook a little in the microwave.  He did no laundry.  He went to the store to get his medication.  He attended church two times a week.  He had done no hunting or fishing since 2005.  He checked his e-mail for 10 minutes a day.  He did no yard work.  On a bad day, his girl friend helped him to dress.  He had five bad days a weeks.  He would just sit and watch television.  Typically, he rose at 10 am, took his medication, watched television, took a shower, ate lunch, and tried to walk around the house and on the porch.  He would write in his journal as part of his mental health therapy.  He might walk outside or go to . . . visit his mother.  He rode in a car with his girlfriend so he would not "freak out."

In response to an inquiry by his attorney, the claimant testified that he would nap for two to three hours a day.  Once in a while, he would fall on the steps.  He had crying spells a few times a week.  His memory was not good, so he had to write things down.

Testimony at the Hearing Held on June 19, 2009

3

> At the supplemental hearing, the claimant testified that he weighs 260 pounds. The claimant has a driver's license, but he drives just once or twice a week. He said that he does not have to drive much because he is close to everything. Despite having back surgery in February 2008, he still has back pain. He is now going to a pain specialist for medication. The back pain is stable on the left side, but now the right side is "acting up." He is on insulin for diabetes, but his sugars fluctuate a lot. His blood pressure is "up and down." He uses inhalers for asthma, but his breathing is affected by heat, cold, and humidity. Because of depression, he cannot concentrate, and it is hard for him to be around people. He has had suicidal thoughts that come and go. He goes to a therapist for counseling every two weeks. He sees a psychiatrist once a month. Medication side effects have included dry mouth, trouble with sleep, and dizziness. He said that his back pain is of an intensity of 7-8/10 and travels into both legs and feet. He carries a cane if he feels weak, but he tries not to use it. He can walk one block and can stand or sit about 15 minutes, each at a time. He can lift a gallon o[f] milk or maybe five pounds. His mind is always "wandering." He continues to have five bad days in a week.
>
> In response to an inquiry by his attorney, the claimant testified that he lies down 50 percent of the day and spends two or three hours napping during the day.

(Tr. 17-18). At the hearing held on December 14, 2011, Boop testified he is 5'7" tall and weighs approximately 240-250 pounds. (Tr. 787). He testified that has been a typical weight for him. (*Id.*). Boop lives in an apartment with his girlfriend. (Tr. 788). He stated he does not drive very often, only once or twice a week. (*Id.*). He also testified he graduated from high school, is able to read and write, but is a "very poor speller." (Tr. 789). He took some electrical and air conditioning courses as part of his job requirements in 2002. (Tr. 790). Boop testified he has not worked since injuring his back in March 2005, while working as a maintenance supervisor. (Tr. 790-91). He is still having trouble with his back, stating the pain is "[i]n my lower back and up through my shoulders, but mostly my lower back; and legs down both of my legs." (Tr. 792). He had two surgeries on his back, the most recent one completed in October 2010. (*Id.*). He

stated that neither surgery helped. (*Id.*). Boop also testified he received injections prior to the second surgery but they did not help either. (Tr. 792-93). He testified his doctor prescribes him medication and he is "trying to get into pain management . . . [b]ut medical won't cover it." (Tr. 793). Boop also has diabetes, which he stated makes him tired and he has not been able to control well with medication and insulin. (Tr. 794). He also uses a cane his doctor prescribed him due to "falling a lot." (Tr. 795). He stated, "I'm always in pain. I'm never out of pain." (Tr. 801). On a scale of 0 to 10, with 10 being the worst, Boop testified his pain level is "[p]robably seven." (Tr. 802). He also testified the pain goes into his upper spine and both arms. (*Id.*). He testified his medication "dulls" the pain a little bit. (Tr. 803). He stated he is most comfortable while sitting, but usually alternates positions because if he stays in one position too long his legs go numb. (Tr. 803).

As to his mental impairments, Boop testified he has obsessive compulsive disorder, panic attacks, and depression. (Tr. 796). His panic attacks can be triggered by "anything, mostly crowds, or people around [him], or if something that's emotional towards [him] it just sets [him] off." (*Id.*). He testified his depression makes him want to sleep a lot, and "just really brings me down. I mean, it just – depression, I mean, it gets so bad sometimes, you know. I mean, sometimes you don't want to be here, you know. You just get tired of everything. You just don't want to be here." (Tr. 796). Boop had thoughts of suicide, but he stated he sees his minister and a psychiatrist who help him. (*Id.*). He sees his psychiatrist once a month, and meets with his minister "at least a couple

5

of times a month. (Tr. 797-99). He used to see a therapist – instead of his minister – but his therapist retired and he has not yet found a new one. (*Id.*). He explained he is meeting with his minister for additional assistance in the interim. (*Id.*). He stated he has been in counseling since 2006 or 2007. (Tr. 799).

Boop also testified that he can only sleep about 2 to 4 hours a night due to pain. (Tr. 804). He also testified he has sleep apnea but "[does not] have a sleep apnea machine because [his] medical will not cover it . . . ." (Tr. 812). He estimated he can only walk about half a block, and is unable to walk further due to pain. (*Id.*). He stated he tries not to stand a lot, and can only do so for about 5 to 10 minutes at a time. (*Id.*). He stated he can sit for 15 to 20 minutes. (Tr. 805). Boop estimated he can lift about a gallon of milk. (*Id.*). He is able to climb steps, albeit "slowly." (*Id.*). He testified he does not take a bus or ride any public transportation. (*Id.*). Boop testified he does not cook, wash dishes, sweep, mop, vacuum, wash clothes, or make beds. (Tr. 806). He testified his girlfriend does these chores for him, as he is not able to bend "without hurting." (*Id.*). Boop testified he can use the microwave "once in a while" to heat up meals when his girlfriend is not around. (Tr. 807). He also testified he can go to the grocery store with her, and goes to church about once a month. (*Id.*). He stated he never goes to the movies, and has no hobbies. (Tr. 808). He used to go hunting and fishing but has not done so since he was injured in 2005. (Tr. 808). He does not do any yard work or gardening, has not taken any trips out of state in the last few years, and does not drink alcohol, use drugs, or smoke. (Tr. 808-09).

As to a typical day, Boop testified he wakes up around 8:00 or 9:00 a.m., eats breakfast his girlfriend has prepared, and then will lay down and watch television until 12:00 or 1:00 p.m. (unless he has a doctor's appointment).  (Tr. 809).  In the afternoon he eats lunch and then usually sleeps, although he stated he goes online to use Facebook "once in a while."  (Tr. 809-10).  In the evening he eats dinner and sometimes watches a movie with his girlfriend.  (Tr. 810).

      **B.**    **Vocational Expert Testimony**

A Vocational Expert ("VE") testified at the December 2011 hearing regarding Boop's past employment.  The VE classified Boop's previous job as a maintenance repairer (building), as skilled and performed at the medium exertional level.  (Tr. 817).  The VE was asked to consider a hypothetical worker of Boop's approximate age, education, work experience, and RFC for light work, who is unable to climb ropes, ladders or scaffolds; unable to kneel, crouch, or crawl; can only occasionally climb stairs, stoop, push, and pull; can only occasionally be exposed to concentrated amounts of irritants; cannot be required to maintain concentration on a single task for longer than 15 minutes at a time; and is not to be exposed to hazards such as dangerous machinery and unprotected heights.  (Tr. 817).  The VE was then asked, considering those circumstances, if any jobs would be available for such a hypothetical person.  (Tr. 818).  In response, the VE testified such an individual could perform approximately 16,000 jobs in the region, including labeler, inspector, hand packager, and silver wrapper.  (*Id.*).

Given the same circumstances, but at the sedentary level, there would be

approximately 3,500 jobs available in the region, including document preparer (microfilm), and table worker (addresser).  (Tr. 818).  If the hypothetical person also needed an opportunity to alternate between siting and standing at 30-minute intervals, the VE testified the number of jobs at the light level would be reduced to 12,000.  (*Id.*).  The number of jobs available at the sedentary level would remain unchanged.  (*Id.*).  The ALJ provided a number of additional limitations, all of which the VE testified would not further reduce the number of jobs available at the light or sedentary level.  (Tr. 818-820).

When cross-examination by Plaintiff's counsel, the VE testified that if the hypothetical worker was off-task 15 minutes of every hour, he or she would be incapable of working because it would interfere with productivity.  (Tr. 821).  The VE also testified that if the hypothetical worker was only capable of lifting and carrying one-third of the day, all jobs previously listed as available would also be eliminated.  (Tr. 830).

C.  **Relevant Medical Evidence**

Previously, this Court summarized Boop's medical evidence as follows:

In March 2005, Plaintiff suffered a back injury while tossing a trash bag into a dumpster. (Tr. 168, 188).  Plaintiff sought treatment from Dr. Figel on March 31, 2005, who noted that Plaintiff complained of pain in the low back and numbness starting in his left low back radiating across to his hip.  (Tr. 169-70).  Dr. Figel noted further that Plaintiff weighed 246 pounds.  *Id.*  Dr. Figel referred Plaintiff for neurologic evaluation.  *Id.*

Plaintiff consulted with neurosurgeon Dr. Flannagan on April 21, 2005, who noted that Plaintiff had complaints of back pain radiating into the left hip and posterolateral leg.  (Tr. 192-93).  Dr. Flannagan also noted that Plaintiff was "a very heavyset gentleman", that his strength was 5/5 throughout, his reflexes were equal and symmetric bilaterally, he had increased muscle tone in the low back, and that there was mild tenderness over those muscles.  *Id.*

8

On July 27, 2005, Dr. Flannagan noted that a MRI performed on April 6, 2005, revealed a left paracentral L4-L5 disc herniation. (Tr. 188-89). Dr. Flannagan identified Plaintiff's diagnosis as left L5 radiculopathy secondary to the L4-L5 herniation. *Id.* Dr. Flannagan reported that Plaintiff had failed conservative treatment and "persisted with pain". He recommended that Plaintiff "remain off work until we proceed with operative decompression of the L5 nerve root which I do believe will relieve his symptoms and allow him to return to normal activities after recovery." *Id.*

Plaintiff sought emergency room treatment on January 12, 2006, for complaints of sharp low back pain which he rated as nine out of ten and which radiated to his thigh. (Tr. 195-204). Plaintiff reported that his pain was exacerbated by movement and dulled slightly by Tylenol. *Id.* Plaintiff was treated with medications and released. *Id.*

Plaintiff again sought emergency room treatment on January 24, 2006, with complaints of stabbing and sharp low back pain, rating the pain at ten out of ten, and which radiated to his abdomen, leading to nausea and dry heaves. (Tr. 205-25). Plaintiff was treated with medications and released. *Id.*

Examining psychologist Dr. Kramer noted on November 6, 2006, that Plaintiff presented as nervous, tense, and ill-at-ease, seemed mildly depressed but was not under acute emotional distress, reported feeling hopeless and helpless, being socially withdrawn, and experiencing panic attacks in public places, and that he had always had some problems with anxiety and depression, but these problems have gotten worse since he has had to stop working. (Tr. 233-39). Dr. Kramer also noted that Plaintiff completed high school but was in learning disabled classes, had a history of mental health counseling and was currently involved in outpatient counseling, was well oriented, and showed no evidence of any thought disorder. *Id.* Dr. Kramer reported that Plaintiff appeared to be of average intelligence, his affect showed some evidence of anxiety, his thought process was normal, his affect showed evidence of mild depression and discouragement but no acute emotional distress, and that he was oriented. *Id.* Dr. Kramer also reported that Plaintiff appeared to possess the necessary insight and judgment to live independently, to make decisions regarding his future, and to manage his own funds. *Id.* Dr. Kramer identified Plaintiff's diagnoses as panic disorder with agoraphobia and major depression; he assigned Plaintiff [a] GAF of 52. *Id.* Dr. Kramer opined that Plaintiff was markedly impaired in his ability to related to others, including co-workers and supervisors, and moderately impaired in his abilities to understand, remember, and follow instructions, to maintain attention, concentration, persistence and pace to perform simple, repetitive tasks, and to

9

withstand stress and pressure associated with day-to-day work activities. *Id.* Dr. Kramer opined that Plaintiff could perform simple and repetitive tasks that do not involve social interaction or stress. *Id.*

A MRI of Plaintiff's lumbar spine performed in October, 2007, revealed focal soft disc protrusions at L4-L5, facet arthritis, moderate central stenosis, and mild impingement on the left L5 and right S1 nerve roots. (Tr. 259-60).

Plaintiff consulted with pain specialist Dr. Smith on November 20, 2007, at which time Dr. Smith noted that Plaintiff reported that his pain was throbbing and constant, accompanied by weakness and numbness in the legs and back, that Darvocet "helps a little," past physical therapy made the pain worse, and that nerve blocks were not effective at all. (Tr. 261-71). Dr. Smith noted further that Plaintiff weighed 240 pounds and he identified Plaintiff's diagnoses as lumbar stenosis, lumbar disk protrusion, and intractable pain. *Id.*

A January 7, 2008, MRI of Plaintiff's lumbar spine demonstrated spondylitic and discogenic changes at L4/L5 and L5/S1. (Tr. 272-73).

Plaintiff underwent a microlumbar discectomy at L4/L5 on the left and L5/S1 on the right on February 21, 2008, which Dr. Minella performed. (Tr. 274-90). At the time of his admission to the hospital, Plaintiff weighed 251 pounds. *Id.*

A post surgical follow-up MRI of Plaintiff's lumbar spine performed on April 5, 2008, showed essentially normal vertebral body height and alignment, some likely disc protrusions, "probably at least some" residual central protrusion less prominent than in previous exams, facet hypertrophy with some narrowing of the central canal, and very little foraminal compromise. (Tr. 291-92).

Plaintiff continued to complain of pain and on April 29, 2008, Dr. Smith identified Plaintiff's diagnosis as status post-laminectomy syndrome and he performed a transforaminal epidural steroid injection. (Tr. 295-300). At the time of that procedure, Plaintiff weighed 240 pounds. *Id.*

In May, 2008, Plaintiff underwent a physical therapy evaluation, with sessions scheduled twice a week for four to six weeks. (Tr. 301-05). Plaintiff's goals were to decrease pain and increase range of motion and strength. *Id.* The physical therapist determined that Plaintiff's potential for achieving his goals was "good." *Id.*

10

On August 6, 2008, Dr. Minella reported that Plaintiff was six months postoperative, that he still had back pain and numbness in his left leg, and that Plaintiff had reached "Maximum Medical Benefit."  (Tr. 332).

Plaintiff sought mental health treatment at Advanced Therapeutic Services on August 14, 2008.  (Tr. 351-53).  At the time of Plaintiff's evaluation, the therapist noted that Plaintiff sought treatment for anger issues, past suicidal thoughts, panic attacks in large groups, three to six hours [of] sleep per night, and a tendency to cry easily, that he reported that he "feels he's being watched or judged when in crowds", and his diagnosis was identified as generalized anxiety disorder. *Id.*

Dr. Gollamudi, a psychiatrist at Advanced Therapeutics, reported on August 28, 2008, that Plaintiff was depressed, that his diagnosis was depression with adjustment disorder, and that his GAF was 51.  (Tr. 348-50; *see also*, Tr. 361-63). Plaintiff saw Dr. Gollamudi once per month through May, 2009, and his therapist approximately every two weeks through May, 2009.  (Tr. 342-74, 388-98).

In September, 2008, Dr. Gollamudi reported that Plaintiff was moderately to markedly limited in his abilities to perform work-related mental functions.  (Tr. 343-44).  Dr. Gollamudi also reported that Plaintiff was markedly limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, accept instructions and respond appropriately to criticism from supervisors, and to set realistic goals or make plans independently of others.  *Id.* Dr. Gollamudi noted that she based her findings on Plaintiff's depression, anxiety, insomnia, and paranoia.  *Id.*  Dr. Gollamudi concluded that these limitations could be expected to last 12 months or more, and that Plaintiff was unemployable.  *Id.*

In November 2008, Dr. Gollamudi and Plaintiff's counselor wrote a joint letter, explaining that "Plaintiff has a history of depression and anxiety, which could create a difficult situation for him in the work place."  (Tr. 370).

Examining physician Dr. Onamusi reported on March 19, 2007, that Plaintiff weighed 265 pounds, walked with a slow gait, had mild difficulty transferring on and off the exam table, had difficulty with range of motion in the spine causing increased pain in the lower back, and was unable to squat.  (Tr. 375-87).  Dr. Onamusi also reported that Plaintiff was tender to palpation along the lower lumbar region with no appreciable muscle spasm, had negative straight leg raising bilaterally and diminished reflexes in both legs, and that he had good strength bilaterally.  *Id.*  Dr. Onamusi identified Plaintiff's diagnosis as chronic low back pain, status post-surgery with degenerative changes.  *Id.*  Dr. Onamusi

11

opined that Plaintiff was able to engage successfully in sedentary to light physical demand level activities, and was able to occasionally lift and/or carry up to twenty pounds, sit for up to four hours in an eight-hour workday, stand for up to two hours in an eight-hour workday, and walk for up to two hours in an eight-hour workday. *Id.*

(Tr. 510-515). A review of the record also indicates Boop submitted additional records for consideration upon remand. These records indicate that Boop had an Electromyography Study (EMG) of his upper and lower extremities completed on June 14, 2010. (Tr. 581). The EMG indicated polyneuropathy in the right lower extremity, a pattern of denervation suggesting a superimposed L5 and S1 radiculopathies in the left upper extremity, and muscle loss in the right upper extremity suggestive of mild right L5 radiculopathies. *Id.*

In August 2010, Boop had a MRI of his spine completed. (Tr. 594). The results showed recurrent left paracentral L4-5 disk protrusion effacing the left lateral recess and scarring. (*Id.*). After reviewing the MRI results, Boop was scheduled for a second microdiskectomy surgery by Dr. Minella. (Tr. 593). One month after surgery, Dr. Minella reported Boop had minimal leg pain but "[h]is back is still sore." (Tr. 592).

After Boop ended treatment with Dr. Gollamudi at Advanced Therapeutic Services in November 2008, he later began treatment at South Community Behavioral Healthcare with Dr. Songer. (Tr. 361, 697). At his initial evaluation, it was noted that Boop had an increase in depression, anxiety, anger, and crying, while a decrease in concentration, sleep, and energy. (Tr. 697). It was also reported he felt overwhelmed, hopeless/helpless, worthless, and had suicidal ideation approximately three weeks before when he planned

12

to shoot himself with a gun.  (*Id.*).

Boop treated with a therapist and Dr. Songer on a monthly basis for the following two years.  (Tr. 635-91).  He continued to have problems, particularly with his anger.  (Tr. 644, 648, 651, 653, 665, 685,689).  In January 2011 Boop's therapy at South Community Behavioral Healthcare was discontinued, and he was referred elsewhere for a decreased level of care.  (Tr. 635).  Boop was "upset" about his therapy being discontinued, but also understood he could "have a second episode of therapy if he needs it."  (Tr. 638).  Boop stated he would get counseling from his church, and continued to obtain psychiatric care with Dr. Songer.  (Tr. 635-37, 648-51).

## III.    <u>Administrative Review</u>

### A.    <u>"Disability" Defined</u>

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job, and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v.*

*Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

**B.      Social Security Regulations**

Administrative regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  *See PageID##* 68-70; *see also* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential review answers five questions:

1.      Has the claimant engaged in substantial gainful activity?

2.      Does the claimant suffer from one or more severe impairments?

3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4.      Considering the claimant's residual functional capacity, can he perform his past relevant work?

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

**C.      ALJ McNichols' 2012 Decision**

Boop last met the insured status requirements of the Social Security Act through December 31, 2009.  (Tr. 496).

At Step 2 of the sequential evaluation, ALJ McNichols concluded that Boop has the severe impairments of chronic low back pain status post surgery (x2); diabetes mellitus; depression; anxiety; obsessive-compulsive disorder; and obesity.  (*Id.*).

The ALJ concluded at Step 3 that Boop did not have an impairment or combination of impairments that met or equaled one of the Listings, including sections 1.02, 1.04, 9.08, 12.04, and 12.06.  (Tr. 498).

At Step 4, the ALJ evaluated Boop's residual functional capacity ("RFC") and found that he could perform sedentary work, subject to the following requirements: occasional climbing of stairs; no climbing of ropes, ladders, or scaffolds; occasional stooping; no kneeling, crouching, or crawling; occasional pushing and pulling; no exposure to hazards; occasional exposure to irritants; no direct dealing with the general public; requires the opportunity to alternate between sitting and standing at 30-minute intervals; can frequently work above shoulder level; occasional use foot controls; no requirement to maintain concentration on a single task for longer than 15 minutes at a time; only limited contact with coworkers and supervisors; no teamwork; and must be allowed to use a cane to ambulate.  (Tr. 500).

The ALJ concluded at Step 4 that Boop was unable to perform any past relevant work.  (Tr. 504).

At Step 5, based on testimony from the VE, the ALJ concluded that – considering Boop's age, education, work experience, and RFC – he is capable of performing a significant number of jobs in the national economy.  (Tr. 505).

15

The ALJ's findings throughout his sequential evaluation led him to again conclude that Boop was not under a disability, and thus not eligible for DIB or SSI.  (*Id.*).

## IV.  __Judicial Review__

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . ." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial

16

evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part

*Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541,

546-47 (6th Cir. 2004)).

## V.   <u>Discussion</u>

Boop first challenges ALJ McNichols' "half-hearted attempt to comply with this

Court's order" requiring, on remand, that he consider obesity in compliance with Social

Security Ruling 02-01p.  (Doc. #11, *PageID#* 55).

Indeed, the ALJ's first decision – issued in July 2009 – failed to discuss Boop's

obesity.  (Tr. 15-26).  As such, Magistrate Judge Michael R. Merz issued a Report and

Recommendations on November 23, 2010, finding the ALJ did not properly consider

Boop's obesity and his decision was not support by substantial evidence:

> From a reading of Judge McNichols' decision it is not possible to determine how much weight, if any, he put on Plaintiff's obesity when he evaluated the credibility of his alleged symptoms and determined Plaintiff's residual functional capacity. Plaintiff's obesity has a direct bearing on his residual functional capacity. *See Boston v. Barnhart*, 332 F.Supp.2d 879, 888 (D. Md. 2004) ("Although the ALJ acknowledged that Plaintiff has sleep apnea, she failed to discuss any possible impact of sleep apnea in combination with the obesity on the Plaintiff's residual functional capacity.").  This Court concludes that this is especially significant in light of Plaintiff's BMI which surpasses even the Commissioner's Level III as described in SSR 02-01p.  Since Judge McNichols' opinion does not reference SSR 02-01p and does not acknowledge the procedure set out in the Ruling for evaluating obesity, it is not possible for the Court to determine whether Judge McNichols' decision is consistent with the Act, Regulations, and SSR 02-01p. Additionally, the court notes that Judge McNichols' referred to Plaintiff's weight only once and that was when he summarized Plaintiff's hearing testimony (Tr. 17-

17

18).  Stated differently, the Commissioner's failure to consider Plaintiff's obesity as required by SSR 02-01p reflects the Commissioner's failure to consider the record as a whole.

The Magistrate Judge ultimately recommended remanding this case for further consideration.  The Commissioner did not file Objections.  On December 16, 2010, District Judge Walter Herbert Rice adopted the Report and Recommendations, reversed the decision of the Commissioner that Plaintiff is not disabled, remanded the matter for further administrative proceedings, and terminated the case on the Court's docket.  (Tr. 521).

ALJ McNichols issued his second decision on January 18, 2012.  (Tr. 494-506). He again concluded Boop was not disabled.  This time, the ALJ listed Boop's obesity as a "severe" impairment, but merely added a few sentences regarding the consideration it was given.

Specifically, the ALJ only provided the following additional points regarding obesity:  (1) "In accordance with SSR 02-1p, the undersigned has considered the impact obesity has on limitation of function including the claimant's ability to perform routine movement and necessary physical activity within the work environment." (Tr. 497); (2) "While [Boop] may have limitations (including the effects of his obesity), his functional abilities are not representative of someone who is disabled."  (Tr. 501); and (3) "After giving adequate consideration, it is reasonable to reduce the claimant's exertional capabilities and limit him to a reduced range of sedentary exertion."  (Tr. 502).

Boop contends this was a "half-hearted attempt to comply" with the Court's order,

18

but such a characterization may actually be too generous.  Indeed, it is somewhat puzzling

to the Court why the ALJ provided such minimal discussion regarding obesity,

particularly in light of the Magistrate Judge's informative Report and Recommendations.

Again, that Report and Recommendations provided the following guidance for remand:

> SSR 02-01p provides that at step two of the five step evaluation, obesity
> may be considered severe alone or in combination with another medically
> determinable impairment.  It further provides that the Administration will do "an
> individualized assessment of the impact of obesity on an individual's functioning
> when deciding whether the impairment is severe."  SSR 02-01p[6].  SSR 02-01p
> also explains that a claimant's obesity must be considered not only at step two of
> the Commissioner's five step evaluation process, but also at the subsequent steps.
> The Ruling provides that:
>
>> The effects of obesity may not be obvious.  For example, some people with
>> obesity also have sleep apnea . . . An assessment should also be made of the
>> effect obesity has upon the individual's ability to perform routine
>> movement and necessary physical activity within the work environment.
>> Individuals with obesity may have problems with the ability to sustain a
>> function over time . . . [O]ur RFC assessments must consider an
>> individual's maximum remaining ability to do sustained work activities in
>> an ordinary work setting on a regular continuing basis . . . . In cases
>> involving obesity, fatigue may affect the individual's physical and mental
>> ability to sustain work activity.  This may be particularly true in cases
>> involving sleep apnea.
>>
>> The combined effects of obesity with other impairments may be greater
>> than might be expected without obesity.  For example, someone with
>> obesity and arthritis affecting a weight-bearing joint may have more pain
>> and limitation than might be expected from arthritis alone.

(Tr. 516-17)(quoting SSR 02-01p, and citing 20 C.F.R. § 404.1523).

To the extent the Commissioner may contend the ALJ's present reference to

Boop's obesity – albeit brief – is nonetheless sufficient to satisfy the requirements of SSR

02-01p, the Court finds this argument lacks merit.

In a recent and analogous case, District Judge Rice rejected the report and recommendations of a Magistrate Judge finding, in part, that the ALJ properly analyzed a plaintiff's allegations of obesity. *Stone v. Comm'r of Soc. Sec.*, 3:12cv00197, 2013 U.S. Dist. LEXIS 138841 (S.D. Ohio September 26, 2013). In that case, the Magistrate Judge concluded:

> In considering Plaintiff's allegations of disability, Judge McNichols specifically noted that the 'primary impairment and the source of many of Plaintiff's underlying problems is obesity at a height of 72 inches and weight of 487 pounds.' PageID 66. In addition, Judge McNichols noted that Plaintiff's obesity aggravated his other impairments and body systems, and that the medical experts of record consistently documented Plaintiff's obesity. PageID 72; 73. Judge McNichols determined that Plaintiff's obesity is a severe impairment and he recognized its effects on his other alleged impairments. That is exactly what SSR 02-01p, 2002 SSR LEXIS 1 requires. The Commissioner did not err by failing to properly evaluate Plaintiff's obesity pursuant to SSR 02-01p, 2002 SSR LEXIS 1.

*Stone v. Comm'r of Soc. Sec.*, 3:12cv00197, 2013 U.S. Dist. LEXIS 24894, *19 (S.D. Ohio February 22, 2013). District Judge Rice rejected this reasoning. Instead, he held as follows regarding the sufficiency of the ALJ's minimal discussion regarding obesity:

> While giving passing reference to *Social Security Rule 02-1p, 2002 SSR LEXIS 1*, and acknowledging that 'the claimant's obesity constitutes an impairment that results in functional limitations as provided' in that Ruling, and that '[t]he claimant's obesity acts to aggravate symptoms of his other documented impairments,' to wit: the severe impairments of obesity; chronic low back, right hip, and bilateral knee pain; history of sleep apnea, history of asthma; and history mood disorder, Tr. at 13, said Hearing Officer never again mentioned said Rule nor performed the required 'individualized assessment of the impact of obesity on an individual's functioning . . .' keeping in mind that 'the Rule also explains that a claimant's obesity must also be considered not only at Step 2 of the sequential evaluation process [in determining the existence of severe impairments], but also at subsequent steps.' While the Court agrees with the Magistrate Judge's conclusion that '[i]t is a mischaracterization to suggest that SSR 02-1p, 2002 SSR LEXIS 1 offers any particular procedural mode of analysis for obesity claimants,'

some analysis of the aggravating tendencies on function caused by obesity, in conjunction with and upon all other severe impairments found by the Hearing Officer, must be performed.

*Stone*, 2013 U.S. Dist. LEXIS 138841 at *6-7. Here, the ALJ provided even less discussion regarding Boop's obesity than he did regarding the plaintiff's obesity in *Stone*. Accordingly, the Court finds the ALJ has again failed to properly consider Boop's obesity pursuant to SSR 02-01p.

Not only is the ALJ's opinion therefore not supported by substantial evidence, however, it appears this Court's previous order requiring proper consideration of Boop's obesity was not closely reviewed.  In a similar case, this Court noted that Social Security ALJs are not free to ignore Judicial Orders and doing so is itself legal error, subject to reversal.  *See Spence v. Colvin*, 2013 U.S. Dist. LEXIS 142552, *37 (S.D. Ohio Oct. 2, 2013) (Ovington, M.J.) (citing *Hollins v. Massanari*, 49 Fed. App'x 533, 536 (6th Cir. 2002)), *report and recommendations adopted without objections by*, 2013 U.S. Dist. LEXIS 154950 (Oct. 29, 2013) (Rose, D.J.).  In *Spence*, the Court determined that the ALJ failed to comply with the Court's remand order requiring further consideration of the plaintiff's fibromyalgia when the ALJ merely "incorporated by reference" the same findings from his first decision that were previously rejected by the Court as being unsupported by the record.  *Spence*, 2013 U.S. Dist. LEXIS 142552 at *36-37.  ("Not only are these findings by the ALJ unsupported by the record, but ALJ McNichols either overlooked or simply ignored the findings of this Court in the Decision and Entry issued by Judge Rice on September 28, 2009.").

21

Although the ALJ's failure to properly consider obesity is itself a sufficient reason for reversal, the Court also finds the ALJ further erred by failing to properly weigh the opinion of Boop's treating psychiatrist, Dr. Gollamudi.  (Doc. #11, *PageID##* 55-60).

Social Security Regulations recognize that the applicant's treating physicians are, in general, "likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the applicant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 416.927(d)(2).  Generally, then, the Social Security Administration places more weight on the opinions provided by treating physicians than on the opinions of non-treating physicians.  20 C.F.R. §§416.927(d)(1)-(2); *see Gayheart v. Comm'r Social Sec*., 710 F.3d 365, 375 (6th Cir. 2013).  To earn "controlling weight," and hence dispositive status, the treating physician's opinion must be both well supported by medically acceptable data and not inconsistent with other substantial evidence of record.  *Gayheart*, 710 F.3d at 376; *see Wilson v. Comm'r of Social Sec*., 378 F.3d 541, 544 (6th Cir. 2004); *see* 20 C.F.R. §416.927(d)(2).

> When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.  However, in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding.

22

*Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (citing, in part, Social

Security Ruling 96–2p, 1996 WL 374188 at *4).

In the event the ALJ decides to reject or discount a treating physician's opinion,

the ALJ must adhere to an additional procedural requirement by providing "good

reasons" for viewing unfavorably the treating physician's opinions. *Rogers*, 486 F.3d at

242; *see* 20 C.F.R. §416.927(d)(2).

> These reasons must be "supported by the evidence in the case record,
> and must be sufficiently specific to make clear to any subsequent reviewers
> the weight the adjudicator gave to the treating source's medical opinion and
> the reasons for that weight." Soc. Sec. Rul. No. 96–2p, 1996 WL 374188, at
> *5 (July 2, 1996). This procedural requirement "ensures that the ALJ
> applies the treating physician rule and permits meaningful review of the
> ALJ's application of the rule."

*Gayheart*, 710 F.3d at 376 (quoting, in part, *Wilson*, 378 F.3d at 544).  ALJ McNichols

rejected the opinion of Dr. Gollamudi as follows:

> It is acknowledged that Dr. Gollamudi, the claimant's treating psychiatrist,
> prepared a report for the county medical services in September 2008 wherein it
> was declared that the claimant was "unemployable" with marked impairment of
> extended concentration, ability to accept supervisory authority, and capacity to set
> goals and make plans independently.  (Exhibit 24F).  However, Dr. Gollamudi's
> overall pessimism is not supported by detailed clinical findings and is not even
> consistent with progress notes from Advanced Therapeutics.  Indeed, most
> progress notes reflect "normal" findings and show the claimant to be improved
> with therapy and often euthymic (Exhibits 26F and 27F).  On the evaluation form
> prepared by Dr. Gollamudi, most categories of mental function were noted to be
> just moderately impacted.  In terms of supportability and consistency with the
> overall record, the pessimistic general opinion of Dr. Gollamudi receives low
> marks; and that doctor's opinion as to the claimant's "employability" is accorded
> no controlling or deferential weight.

(Tr. 503).  The Commissioner contends the ALJ's rejection of Dr. Gollamudi's opinion

23

was proper because he noted that most progress notes indicated normal findings, Boop was improving with therapy, and most categories of mental function were only moderately impacted. (Doc. #15, *PageID##* 78-79). According to Boop, the reasons the ALJ gave for providing Dr. Gollamudi's opinion little weight were "contradictory to the evidence of record and . . . insufficiently specific." (Doc. #11, *PageID#* 57).

Indeed, a review of the record indicates the ALJ's findings are not supported by substantial evidence. For example, while the ALJ concluded that Dr. Gollamudi's opinion is not consistent with progress notes and that "most progress notes reflect 'normal' findings," (Tr. 503), the record does not support this conclusion. Although Boop's mental impairments did wax and wane over the course of his treatment, a review of the longitudinal record shows that he made, at most, only marginal progress since obtaining treatment. This is so despite Boop's compliance with medication and treatment recommendations. This point appears further evidenced by additional medical records provided by Boop on remand from South Community Behavioral Healthcare ("SCBH"). Shortly after treating with Dr. Gollamudi at Advanced Therapeutic Services, Boop began treating at South Community Behavioral Healthcare with Dr. Songer. (Tr. 697). Notes from SCBH indicated in July 2009 that Boop's prognosis was guarded and his mental health history "had mixed effectiveness." (Tr. 710). It was noted that his depression, anxiety, and mood swings were increasing. (Tr. 708). Although such notes seem to support Dr. Gollamudi's opinion, the ALJ did not address this evidence when deciding for a second time how much weight to provide to Dr. Gollamudi's opinion. Rather, it

24

appears the ALJ simply reused the same analysis from his July 2009 opinion when rejecting Dr. Gollamudi's opinion in his recent opinion, even though the record now also contained new evidence from another treating source regarding Boop's mental health. *Cf.* Tr. 23-24, 502-503.

For the reasons stated above, Boop's Statement of Errors is well-taken.

## VI.  Reversal and Remand for Benefits

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

Boop filed for Disability Insurance Benefits in January 2006, more than eight years ago.  Since that time, Boop has attended, and testified at, three administrative hearings before the same ALJ.  In December 2010 this case was remanded to the Commissioner and the ALJ in order to properly address Boop's obesity, and determine anew whether he was under a disability and eligible for DIB and SSI.  Rather than doing so, the ALJ appears to have simply reused much of his original decision, with only, at

best, a passing reference to the very issue ordered to be addressed on remand – Boop's obesity. While it is understandable that certain portions of an ALJ's previous decision may be included again in a subsequent decision, the ALJ's doing so in this case was at times improper. For example, in deciding to reject Dr. Gollamudi's opinion for a second time, the ALJ simply reused the same analysis he previously provided, despite the fact the record contained additional mental health records submitted on remand. Thus, while this evidence of Boop's mental health is clearly relevant, there is no indication the ALJ considered it when again deciding to reject Dr. Gollamudi's opinion.

Nonetheless, there is no concern such errors will be committed a third time, as the Court finds this matter need not be remanded for further consideration, but rather for the payment of benefits. In reaching this conclusion, the Court has considered the record as a whole, including the VE's testimony, Boop's testimony, work history, and medical evidence. The Court notes that Boop's testimony, over the course of many years, has not only been consistent as a whole, but has been consistent with the medical evidence of record, including those submitted upon remand. Likewise, all factual issues have been resolved and the record as a whole supports a finding of disability. This is so particularly when considering the limitations Boop faces from the combined effects of his mental and physical impairments, including, in part, his depression, anxiety, back pain, and obesity. A reversal of the ALJ's decision and a judicial award of benefits is therefore warranted in the present case due to the errors identified previously and because the evidence of disability is strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176.

26

**IT THEREFORE IS RECOMMENDED THAT:**

1.      The Commissioner's final non-disability decision be reversed;

2.      Plaintiff Ralph Boop's case be REMANDED to the Social Security Administration for payment of Disability Insurance Benefits based on his claimed disability onset date of March 23, 2005, consistent with the Social Security Act;

3.      Plaintiff Ralph Boop's case be REMANDED to the Social Security Administration for payment of Supplemental Security Income based on his application protectively filed on January 9, 2006, consistent with the Social Security Act; and,

4.      This case be terminated on the docket of this Court.


April 17, 2014


       s/Sharon L. Ovington       
       Sharon L. Ovington
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).